JAVIER MARIN, Plaintiff-Appellee, v. AMERICAN MEAT PACKING COMPANY, Defendant-Appellant.

First District (2nd Division) No. 1—89—1908

Opinion filed September 28, 1990.

McDermott, Will & Emery, of Chicago (Stephen Erf, Nancy Ross and Jennifer Walz, of counsel), for appellant.

Robert H. Hanaford, Ltd., of Chicago (Robert Hanaford and Ken Del Valle, of counsel), for appellee.

JUSTICE HARTMAN delivered the opinion of the court:

Plaintiff, Javier Marin, brought an action for retaliatory discharge against his employer, American Meat Packing Company (AMPAC), claiming he was fired for filing a claim under the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.1 *et seq.*) (Act). A jury found AMPAC liable to Marin in the amount of $74,626.40 in compensatory and $75,000 in punitive damages.

On appeal, AMPAC argues, *inter alia*, that the circuit court erred in denying its motions for judgment notwithstanding the verdict and for a new trial, and in refusing to instruct the jury properly. We reverse and remand for a new trial.

Marin started working at AMPAC, a hog slaughterhouse, in 1975, and was employed there continuously until September 3, 1981, except for a company layoff in 1976 and a work-related injury resulting in a two-week absence in 1978. His duties included butchering.

On September 3, 1981, Marin sprained his back while attempting to pick up some entrails that had fallen to the floor. The next day, his supervisor referred him to the Yards Industrial Clinic for treatment, which he visited five times during the next month. He was hospitalized by his doctor until November 2, 1981. On November 13, 1981, Marin filed a claim with the Industrial Commission and returned to work on December 3, 1981, with a doctor's certificate. He continued

to work until December 8, 1981, when he reinjured his back, returned to the Yards Clinic, and was again hospitalized. Marin was discharged on January 16, 1982, and he returned to AMPAC two to three days later to pick up his compensation check from Cathleen Heffernan, AMPAC's industrial nurse. According to Marin, Heffernan stated, "Oh, Mr. Marin, you are at the hospital. Don't you think that the firm is spending enough money with you at the hospital[?]" She then "threw" the check at him in "anger."

On January 21, 1982, Marin saw Dr. S.P. Kaushal, who had him admitted to Edgewater Hospital the next day. Marin was discharged on February 2, 1982. Dr. Kaushal later recommended physical therapy treatment, to be commenced February 16.

On February 26, 1982, Marin received a certified letter from AMPAC, which he took to his attorney to read. The letter stated that his doctor had released him for return to work on February 16 and that he had not yet reported to work. Marin was informed that if he did not return by February 26, AMPAC would assume that he had voluntarily quit. Marin understood the letter. He averred that he was still under Dr. Kaushal's treatment on February 16 and was not released to work on that date nor was he given a return to work certificate, as required by company policy.

Dr. Kaushal gave Marin his return to work permit at Marin's office visit of March 1, 1982. Marin arrived at work the next day at 7:30 a.m. and gave the permit to Richard Bachert, the plant superintendent. Marin overheard Bachert tell the nurse, "[l]ook at this paper. This stupid doctor gives him light work." The nurse and superintendent then went into the nurse's office. When Bachert came out, he instructed Marin to wait in the cafeteria. Bachert then went into Clark's office, the company "president." When Bachert came out of that office, he told Marin that Mr. Clark said that he no longer had a job. At the close of Marin's testimony, plaintiff rested. The court denied AMPAC's motion for a directed verdict.

Richard Bachert was AMPAC's plant superintendent from August 1979 through May 1982. His responsibilities included the hiring and firing of personnel, as well as employee discipline. His superior was vice-president Larry Clark. Bachert spoke often with Marin, and the conversation was always in English. Bachert asked AMPAC's nurse to follow up on Marin's accident and health status on February 16. Marin's doctor told her that he had released Marin and he was supposed to be at work. The nurse also telephoned Marin's home and spoke with his wife, who told her that she would inform Marin of the situation. Bachert then sent Marin a certified letter stating that he

was to report to work by February 26 or AMPAC would assume that he had voluntarily quit. The return receipt indicated that Marin received the letter on February 26.

On March 2, 1982, Marin reported for work with a doctor's permit and asked Bachert, "Do I still have a job?" Bachert said no, because Marin didn't do what *** [he was] supposed to do by the date *** [he was] supposed to do it." Clark's name was not mentioned during this conversation. Marin was not dressed in his normal work attire.

Cathleen Heffernan worked at AMPAC from November 1981 through January 1985. She corroborated Bachert's account of their February conversation. Heffernan phoned Dr. Kaushal's office and reported to Bachert that the doctor told her Marin's physical therapy had been scheduled for Wednesday evening so as not to interfere with work.

On March 2, 1982, Marin came into her office, presenting Dr. Kaushal's return to work permit. One of her duties at AMPAC was to distribute compensation checks. She had never seen Marin prior to March 2, 1982, and was unaware that he had filed a claim for workers' compensation with the Illinois Industrial Commission. She could not explain the discrepancy between the unrestricted work release that Dr. Kaushal told her about over the phone and the "light work" restriction on the pass Marin presented to her upon his return on March 2, 1982.

Frank Dlugopolski, AMPAC's maintenance supervisor at the time of the incident, was in the lunchroom and overheard the exchange between Marin and Bachert. His testimony mirrored that of Bachert.

Following closing arguments, the jury returned the verdict for Marin as noted above, finding that Marin did not abandon his employment. AMPAC filed post-trial motions for judgment *n.o.v.*, for a new trial, and for remittitur on damages. On June 15, 1989, the circuit court denied AMPAC's motions for judgment *n.o.v.* and for a new trial, but granted its motion for remittitur, reducing the compensatory damages to $66,898.48, based on evidence that Marin would not have worked during a nine-month strike.

## I

AMPAC initially argues that the circuit court erred in denying its motions for judgment *n.o.v.* and for a new trial because the evidence showed that AMPAC discharged Marin for nonretaliatory reasons and that all Marin's rights under the Act were observed.

■■ The tort of retaliatory discharge recognized in *Kelsay v.*

*Motorola, Inc.* (1978), 74 Ill. 2d 172, 384 N.E.2d 353 (*Kelsay*), is an exception to the general rule that "at will" employment is terminable at any time for any or no reason. (*Palmateer v. International Harvester Co.* (1981), 85 Ill. 2d 124, 128, 421 N.E.2d 876.) A strong public policy exists to insure the protection of workers covered by the Act; an employee may bring a civil tort action against an employer for discharging the employee for filing a claim under the Act. *Kelsay*, 74 Ill. 2d 172, 384 N.E.2d 353.

■ To establish a claim of retaliatory discharge, a plaintiff must show that (1) he was an employee of defendant before the injury; (2) he exercised a right granted by the Act; and (3) his discharge was causally related to the filing of a claim under the Act. (*Slover v. Brown* (1986), 140 Ill. App. 3d 618, 620, 488 N.E.2d 1103.) Causality does not exist if the reason for the discharge is valid and nonpretextual. (*Slover v. Brown*, 140 Ill. App. 3d at 621.) A pretext had been defined as "a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs." *Wayne v. Exxon Coal USA, Inc.* (1987), 157 Ill. App. 3d 514, 518, 510 N.E.2d 468.

■ A judgment *n.o.v.* should only be entered in those cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

In the case *sub judice*, in considering all the circumstances, it cannot be said that when all the evidence is viewed most favorably to Marin, it so overwhelmingly favors AMPAC that no verdict in Marin's favor could ever stand.

■ The record supports AMPAC's motion for a new trial, however. The standards relating to a judgment *n.o.v.* and to a motion for a new trial are different. (*Mizowek v. De Franco* (1976), 64 Ill. 2d 303, 310, 356 N.E.2d 32.) A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or the jury's findings are unreasonable, arbitrary and not based upon the evidence. (*Anderson v. Beers* (1979), 74 Ill. App. 3d 619, 393 N.E.2d 552.) On a motion for a new trial, the circuit court must determine whether the jury's verdict was against the manifest weight of the evidence. *Mizowek v. De Franco*, 64 Ill. 2d at 310.

At bar, Marin testified that he filed a workers' compensation claim in November 1981 and received benefits. He returned to work in December without incident. After reinjuring his back, and upon claiming a benefits check, AMPAC's nurse made a disparaging remark

about his hospital bills and "threw" his check at him. Bachert then made the remark about Marin's light work restriction upon Marin's return. Marin, however, offered no evidence that AMPAC hired employees who had light work restrictions or treated those employees differently from other employees without such restriction. The minimal facts presented by Marin do not evince a retaliatory motive for discharge when viewed against the evidence presented by AMPAC.

AMPAC's evidence revealed that the company attempted to restore Marin to active employment February 16. Upon learning from his doctor that Marin should have been back to work, AMPAC phoned Marin's home and told his wife that Marin was to report back to work. When he did not, the company then sent Marin a certified letter, giving him an extra 10 days to return. AMPAC's behavior does not suggest a discharge motivated by retaliation, but rather reflects just the opposite: the company's desire to bring Marin *back to work*. All AMPAC's witnesses corroborated Bachert's account of the events on February 16 and March 2, 1982. Bachert denied knowing about Marin's compensation claim, and Marin introduced no evidence to the contrary. Evidence that those responsible for plaintiff's termination knew he intended to file a workers' compensation claim is "essential" to a retaliatory discharge action. *Mercil v. Federal Express Corp.* (N.D. Ill. 1987), 664 F. Supp. 315, 318.

■ Heffernan's alleged statements prove nothing as to this issue, since she was not a decision maker with respect to Marin's termination. (See *Cannella v. Nationwide Carriers, Inc.* (N.D. Ill. 1988), 687 F. Supp. 362, 365.) Nor can the statement be used to infer a retaliatory motive on the part of Bachert. Bachert's statement itself does not mention workers' compensation, nor does it reveal any form of threat or coercion against Marin for filing a claim. (*Cf. Kelsay*, 74 Ill. 2d at 179.) That an employer may discharge an employee at will for any reason or for no reason "is still the law in Illinois, except when the discharge violates a clearly mandated public policy." (*Barr v. Kelso-Burnett Co.* (1985), 106 Ill. 2d 520, 525, 478 N.E.2d 1354.) The causality element, therefore, requires more than a discharge in connection with filing a claim. *Motsch v. Pine Roofing Co.* (1988), 178 Ill. App. 3d 169, 533 N.E.2d 1.

■ AMPAC here controverted Marin's evidence by presenting its own, which demonstrated a valid, nonpretextual reason for discharging Marin. Marin's argument, that AMPAC's reason was pretextual and that the letter was a ploy, is unsupported by any evidence to that effect. Rather, Marin admitted that he received the letter on February 26, understood its implications, yet did nothing in response to it

until March 2. The evidence showed that Marin was fired for not reporting to work on time as directed by his superiors. Under Illinois law, an employer may fire an employee for excessive absenteeism, even if the absenteeism is caused by an injury which is compensable under the Act. (*Slover v. Brown*, 140 Ill. App. 3d at 621.) The probative value of Marin's scant evidence is diminished when viewed in light of the testimony of AMPAC's employees and the letter it sent to Marin, which tended to show that the company was attempting to restore Marin to employment. Nothing in the record reveals that defendant interfered with, restrained, or coerced Marin in any manner regarding his exercise of the rights and remedies provided to him by the Act.

The record does reflect that Marin and AMPAC were at odds over his return to work date. The exchanges between AMPAC's employees and Marin, however, fall short of the causality needed for retaliatory discharge actions. The jury's verdict, therefore, was against the manifest weight of the evidence required to support a claim of retaliatory discharge. (See *Bryce v. Johnson & Johnson* (1983), 115 Ill. App. 3d 913, 921-23, 450 N.E.2d 1235.) Accordingly, reversal and a new trial is mandated.

## II

A review of the instructions given reinforces the need for a new trial. AMPAC contends that the circuit court erred by refusing to instruct the jury not to substitute its judgment for AMPAC's business judgment regarding its leave of absence policies. The court refused to give AMPAC's non-Illinois Pattern Instructions (IPI) instruction 14 because Marin's "issues instruction tells them what the issue is."[1] Marin asserts that the court correctly refused the proffered instruction because it was argumentative and based on an abstract theory.

Supreme Court Rule 239 (107 Ill. 2d R. 239) governs the giving of non-IPI instructions. The IPI instructions, which were devised for a court to instruct a jury on the law in an impartial and non-argumentative manner, shall be used unless the court determines that they do not accurately state the law. (107 Ill. 2d R. 239; *Powers v.*

---

[1]Defendant's instruction 14 states:

"It is not your role to determine whether Defendant acted wisely or fairly with respect to Plaintiff's separation from employment. Put another way, the jury is not to determine whether Defendant exercised good business judgment or whether its methods were sound. You are only to determine whether Plaintiff was discharged and whether the discharge was in retaliation for exercising rights or remedies granted to him by the Workers' Compensation Act."

*Illinois Central Gulf R.R. Co.* (1982), 91 Ill. 2d 375, 438 N.E.2d 152.) Non-IPI instructions should not be used if the IPI instructions correctly and adequately state the law. (*Kent v. Knox Motor Service, Inc.* (1981), 95 Ill. App. 3d 223, 419 N.E.2d 1253.) Each party, however, has the right to have the jury instructed on its theory of the case, and the circuit court, in the exercise of its discretion, must instruct the jury on all issues which it finds have been raised by the evidence presented. (*Lounsbury v. Yorro* (1984), 124 Ill. App. 3d 745, 751, 464 N. E.2d 866.) A new trial should be granted where a party shows that its right to a fair trial has been seriously prejudiced by the denial of an instruction. *Thompson v. Abbott Laboratories* (1990), 193 Ill. App. 3d 188, 202, 549 N.E.2d 1295.

■■■ In light of these principles, the circuit court erred by not instructing the jury with AMPAC's proposed non-IPI instruction. AMPAC's theory of the case was that Marin was discharged upon returning to work four days past the date he was told to report by his superior; its reason for the discharge was not retaliation, but Marin's disregard of its return to work policy.

AMPAC's instruction is very similar to an instruction cited with approval in *Thompson v. Abbott Laboratories* (193 Ill. App. 3d at 203). There, plaintiff tendered a "mixed motive" for discharge instruction, which was refused. In affirming the refusal, the appellate court noted that defendant's instructions applied the appropriate legal standard in Illinois for retaliatory discharge cases. (*Thompson v. Abbott Laboratories*, 193 Ill. App. 3d at 203.) One of defendant's instructions stated that if the jury found the discharge was not motivated by plaintiff's pursuit of rights under the Act, the element of causality was not satisfied "even if the discharge was unfair, unwise, or otherwise improper." (*Thompson v. Abbott Laboratories*, 193 Ill. App. 3d at 208 (Reinhard, J., concurring).) This instruction, *when coupled with the issues instruction given,* "require[d] the jury to determine the true reason for the discharge, either plaintiff's absenteeism or her filing of a worker's compensation claim, [and is] consistent with Illinois law requiring her to establish causality. Such an approach allows the jury, as the trier of fact, to decide what the true reason was for plaintiff's discharge." *Thompson v. Abbott Laboratories*, 193 Ill. App. 3d at 209 (Reinhard, J., concurring).

As previously noted, an employer may discharge an employee at will for any or no reason except when the discharge violates a clearly mandated public policy, and causality does not exist "if the basis for discharge is valid and nonpretextual." (*Slover v. Brown*, 140 Ill. App. 3d at 621.) Since the employer's motive in firing the employee is the

ultimate issue to be decided (*Austin v. St. Joseph Hospital* (1989), 187 Ill. App. 3d 891, 897, 543 N.E.2d 932), AMPAC's instruction would have allowed the jury to decide whether plaintiff disobeyed reasonable orders and was terminated for good cause. See *Netzel v. United Parcel Service, Inc.* (1989), 181 Ill. App. 3d 808, 812, 537 N.E.2d 1348, *appeal denied* (1989), 127 Ill. 2d 620, 545 N.E.2d 114.

 Although an employee may be discharged without good cause, that in itself cannot justify relief under the tort of retaliatory discharge (*Horton v. Miller Chemical Co.* (7th Cir. 1985), 776 F.2d 1351, 1359 (applying Illinois law)), since the employer must also impede a public policy when discharging the employee. (*Kelsay*, 74 Ill. 2d at 181; *Palmateer v. International Harvester Co.*, 85 Ill. 2d at 131; *Criscione v. Sears, Roebuck & Co.* (1978), 66 Ill. App. 3d 664, 667-68, 384 N.E.2d 91; see also Note, *Good Faith & Fair Dealing in Illinois: An Application in the Employment Context*, 1987 U. Ill. L. Rev. 183, 205-06.) AMPAC presented evidence in support of its theory that, at most, it was guilty of harshly discharging Marin, who returned to work four days late. Its proffered instruction "strikes the appropriate balance between an employee's right not to be fired in contravention of a clearly mandated public policy and an employer's right to discharge an employee at will for any reason or no reason." (*Thompson v. Abbott Laboratories*, 193 Ill. App. 3d at 209 (Reinhard, J., concurring).) AMPAC, therefore, should have been allowed to instruct the jury not to determine whether AMPAC acted fairly, but rather, to determine whether the decision to terminate Marin was in retaliation for filing a workers' compensation claim.

 AMPAC further argues that the circuit court erred in refusing to give the jury its instruction 16, which advised the jury not to award Marin damages for any injury received during his employment. In *Kelsay*, the supreme court noted that the Act was meant to limit recovery by employees to the extent provided by the Act in regard to work-related injuries, but was not intended to insulate the employer from independent tort actions. (*Kelsay*, 74 Ill. 2d at 184.) The extent and permanency of an employee's medical disability are to be decided by the Industrial Commission. (*Garrison v. Industrial Comm'n* (1980), 83 Ill. 2d 375, 415 N.E.2d 352.) An allegation of retaliatory discharge is an independent proceeding which cannot be combined in a workers' compensation action. (*Garrison v. Industrial Comm'n*, 83 Ill. 2d 375, 415 N.E.2d 352.) "[T]he Act [itself] provides that the statutory remedies under it shall serve as the employee's *exclusive* remedy if he sustains a compensable injury." (Emphasis added.) *Sharp v. Gallagher* (1983), 95 Ill. 2d 322, 326, 447 N.E.2d 786.

312

■■ Marin argues that the given damage instruction, which fixed the dates for damages as March 2, 1982, up until the date of trial, adequately instructed the jury not to award damages for the work-related injury. The jury, however, heard testimony from Marin regarding his injury—including the fact that he was hospitalized three times for fairly long periods of time, saw several doctors and needed physical therapy three times a week. Given the nature of Marin's testimony and the circumstances surrounding his separation from AMPAC, such an instruction is warranted because it clearly informs the jury to reward only for damages incurred as a result of the alleged retaliatory discharge. AMPAC's instruction, therefore, was supported by Illinois law and would have allowed AMPAC to present its theory of the case to the jury. The circuit court erred in refusing this instruction as well.

For the aforesaid reasons, the judgment of the circuit court must be reversed and the cause remanded for further proceedings consistent with this opinion. Other issues raised need not be considered in light of our disposition of this appeal.

Reversed and remanded.

DiVITO, P.J., and BILANDIC, J., concur.